CASE NO. 13-30185

LUTHER SCOTT, JR., for himself and all other persons similarly situated; LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and all other persons similarly situated,

Plaintiffs - Appellees

v.

TOM SCHEDLER, in his official capacity as Louisiana Secretary of State,

Defendant - Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
THE HONORABLE JANE TRICHE-MILAZZO, PRESIDING
(Docket No. 11-926)

# ORIGINAL BRIEF OF APPELLANT, TOM SCHEDLER, IN HIS OFFICIAL CAPACITY AS LOUISIANA SECRETARY OF STATE

CELIA R. CANGELOSI
Louisiana Bar Roll No. 12140
918 Government Street, Suite 101
P. O. Box 3036
Baton Rouge, Louisiana 70821-3036
Telephone: (225) 387-0511

CAREY T. JONES
Louisiana Bar Roll No. 07474
1234 Del Este, Suite 803
P.O. Box 700
Denham Springs, LA 70727
Telephone: (225) 664-0077

*Attorneys for Defendant - Appellant, Tom Schedler, in his Official Capacity as Louisiana Secretary of State*

CERTIFICATE OF INTERESTED PARTIES

| | |
|---|---|
| LUTHER SCOTT, JR., for himself and all other persons similarly situated; LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and all other persons similarly situated,<br>Plaintiffs - Appellees<br><br>v.<br><br>TOM SCHEDLER, in his official capacity as Louisiana Secretary of State,<br>Defendant - Appellant | Docket No. 13-30185 |

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. LUTHER SCOTT, JR., plaintiff-appellee;

2. LOUISIANA STATE CONFERENCE OF THE NAACP, plaintiff-appellee;

3. Ronald L. Wilson, Dale Ho, Leah Camille Aden, Elise Catharine Boddie, Israel David, Ryan Haygood, Natasha Korgaonkar, Jesse Loffler, David Yellin and Michael de Leeuw, attorneys for Plaintiffs-Appellees;

4. Ronald L. Wilson; Dale Ho, Natasha Korgaonkar, Ryan P. Haygood [NAACP Legal Defense & Educational Fund]; Niyati Shah, Michelle Rupp, Sarah Brannon [Project Vote], Israel David, Michael B. De Leeuw, Erica Sollie, David Yellin and Jesse Loffler [Fried, Frank, Harris, Shriver & Jacobson, L.L.P.], attorneys for Plaintiffs in the district court; and

5. Celia R. Cangelosi and Carey T. Jones, attorneys for Defendant-Appellant.

Baton Rouge, Louisiana this 15th day of April, 2013.

s/Celia R. Cangelosi
Celia R. Cangelosi, La. Bar No. 12140

*Attorney for Defendant-Appellee, Tom Schedler*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-appellant believes that oral argument will be helpful to the Court in deciding this case.

The case rests upon a questionable jurisdictional foundation.

The district court decision on the applicability of Section 7 of the NVRA to other than in person transactions disregards the clear language of the Act and represents a novel interpretation of the Act that has not been determined by appellate courts, and a substantial case on the merits is presented for consideration on appeal.

The district court decision of the duties imposed on the Schedler as chief election official in Louisiana to coordinate responsibilities under the NVRA has never been decided by the Court, and is specific to Louisiana.

TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I. STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II. STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. General Principles of Article III Standing. . . . . . . . . . . . . . . . . . . . . . 21

B. Private Right of Act Under NVRA. . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Neither Plaintiff Proved Notice--Statutory Standing Required Under 42USC1973gg-9. . . . . . . . . . . . . . . . . . . . . . . . . . 23

D. Luther Scott Failed to Prove That He Was Injured or Aggrieved By A Violation of the Act Conduct on the Part of the Secretary of State. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

E. State Conference Failed To Prove That It Was Aggrieved By A Violation on Part of the Secretary of State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III. IN PERSON APPLICATIONS - The district court erred in ruling on summary judgment that the "agency registration" provisions of the NVRA extend to "remote" transactions--those made by telephone, mail and online, when the clear language and the architecture of the Act limit its application to "in person" applications. . . . . . . . . . . . . 36

A. Enactment of the National Voter Registration Act. . . . . . . . . . . . . . 37

B. Interpretation of NVRA Provisions Defining Transactions Covered by the Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV. FAILURE TO ENFORCE-District Court Erred by Assigning Enforcement Authority Over Other State Agencies to the Secretary of State as Chief Elections Official and Holding the Secretary of State Responsible for Failure to Enforce NVRA Against State Agencies.. . . . . . . . . . . . . . . . 46

V. DECLINATION FORMS, DISTRIBUTION OF VOTER REGISTRATION FORMS AND THE *VALDEZ* DECISION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI. INJUNCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. The Injunction Is Void For Failure To Comply With F.R.Civ.P. Rule 65(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B. Neither Party Established Irreparable Harm In Order To Entitle It To Injunctive Relief Against the Secretary of State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

VII. PREVAILING PARTY AND ATTORNEY FEES. . . . . . . . . . . . . . . . . . 63

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATE OF COMPLIANCE WITH RULE 32(a). . . . . . . . . . . . . . . . . . . 66

ADDENDUM - National Voter Registration Act. . . . . . . . . . . . . . . . . . . . . . . . . 67

# TABLE OF AUTHORITIES

Page

CASES:

*ACORN Fair Housing v. LeBlanc*,
211 F.3d 298 (5 Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*ACORN v. Edgar,* 56 F.3d 791
(7 Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48

*ACORN v. Fowler*, 178 F.3d 350
(5 Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31, 32, 34

*ACORN v. Miller*, 129 F.3d 833
(6 Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Allen v. Wright*, 468 U.S. 737 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Anthony Ngomi Kariuki v. Tracy Tarango*,
709 F.3d 495 (5 Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Broyles v. Texas*, 628 F.Supp.2d 661
(S.D. Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Cowart v. Nicklos Drilling Co.,* 112 S.Ct. 2589
(1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*DaimlerChrsyler Corporation v. Charlotte Cuno, et al,*
547 U.S. 332 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dobrovolny v. Nebraska,* 100 F.Supp. 1012
(D.Neb. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Elk Grove Unifed School Dist. v. Newdow,* 542 U.S. 1
(2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*First American Bank v. Resolution Trust Corporation,*
30 F.3d 644 (5 Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Flint Hills Resources LP v. JAG Energy, Inc.*,
559 F.3d 373 (5 Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . 21

*Georgia State Conference of NAACP v. Kemp*,
841 F.Supp.2d 1320. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gonzales v. Arizona,* 453 F.Supp.2nd 997
(D. Arizona 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Harkless v. Bruner*, 545 F.3d 445
(6 Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Keyes v. School District No. 1, Denver Colorado*,
895 F.3d 659 (10 Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Krislov v. Rednour*, 946 F.Supp. 563 (N.D. Ill. E.
Div. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lujan v. Defenders of Wildlife,* 504 U.S. 555
(1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lynch v. Alworth-Stephens Co.*, 267 U.S. 364
(1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Marbury v. Madison*, 5 U.S. 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nat'l Coalition for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283
(4 Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*National Council v. Miller*, 2012 WL
6691729 (D. Nev. 12/19/12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33, 62

*Norfolk Southern Railway Co. v. Sorrell*,
549 U.S. 158 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Payne v. Travenol Laboratories, Inc.,* 565
F.2d 895 (5 Cir. 1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Price v. Rosiek Construction Company*,
509 F.3d 704 (5 Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Raines v. Byrd*, 521 U.S. 811 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Roberts v. Wamser,* 883 F.2d 618
(8 Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Rodriguez v. United States,* 480 U.S. 552
(1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*SEC v. Forex Asset Management, LLC*, 242
F.3d 325 (5 Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Schmidt v. Lessard*, 441 U.S. 473
(1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Tanuja Sahai Guil Waggoner v. Alberto R. Gonzales*,
488 F.3d 632 (5 Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 43

*United States Steel Corporation v. United Mine Workers of America*, 519 F.2d 1236 (5 Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . 61

*Valdez v. Herrera*, 2010 U.S. Dist.
LEXIS 142209.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Valdez v. Squier,* 676 F.3d 935
(10 Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55, 58

*Wynn Oil Company v. Purolator Chemical Corporation*,
536 F.2d 84 (5 Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

UNITED STATES CONSTITUTION

U.S. Const., Art. I, §2, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

U.S. Const., Art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 35

FEDERAL STATUTES

28USC1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42USC§1973ff-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

National Voter Registration Act (NVRA):

Section 3, 42USC§1973gg-1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Section 4, 42USC§1973gg-2.. . . . . . 1, 4, 16, 18, 36, 37, 38, 40, 41, 42, 43, 47, 51

Section 5, 42USC§1973gg-3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 41, 46

Section 6, 42USC§1973gg-4.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 47

Section 7, 42USC§1973gg-5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Section 8, 42USC§1973gg-6.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53

Section 9, 42USC§1973gg-7.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Section 10, 42USC§1973gg-8.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 15, 50

Section 11, 42USC§1973gg-9.. . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 8, 23, 24, 28, 29

FEDERAL RULES

FRCP65(d)........................................ 19, 59, 60, 61, 62

FRE103(a)(2)........................................ 21

LOUISIANA STATUTES

La.R.S. 18:18........................................ 7, 48, 49, 50

La.R.S. 101.1........................................ 28

La.R.S. 18:110........................................ 27

La.R.S. 18:115........................................ 28

La.R.S. 18:521........................................ 27

## JURISDICTIONAL STATEMENT

Jurisdiction in the district court was sought under 42USC1973gg-9(b) as the plaintiffs claim to be aggrieved by violations of the NVRA. This court has jurisdiction under 28USC1291 from all final decisions of a district court. Notice of Appeal was filed on February 17, 2013, appealing: (1) "Permanent Injunction" (Doc 437) rendered January 23, 2013; (2) "Findings of Fact and Conclusions of Law" (Doc 436) signed January 22, 2013, and filed January 23, 2013; and (3) Order and Reasons (Doc 212) filed May 3, 2012, granting Plaintiffs' Cross Motion For Summary Judgment. This appeal is from final judgments or orders disposing of all claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The appeal presents the following issues for review:

1. Do the "agency registration" provisions of Sections 4(a)(3) and Section 7 of the NVRA apply to "remote" transactions at mandatory voter registration agencies.
2. Can a federal district court empower the chief election official designated pursuant to 42USC§1973gg-8 to enforce and compel compliance against other state agencies when state law does not do so.
3. Whether the district court erred in exercising jurisdiction over the case -

Neither party produced sufficient evidence to prove Art III and/or statutory standing - Neither party proved injury linked to violation of the NVRA.

4. Did either party demonstrate "irreparable injury" warranting injunctive relief.

5. Whether the district court erred in excluding testimony of Elsie Cangelosi on State's implementation of NVRA, so that Proffer 2 should be considered by this court.

6. Whether the district court erred in declining the Secretary's request for judicial notice of Act 5799 of 2012.

7. Whether the district court erred in finding plaintiffs to be prevailing parties for attorneys fee award.

8. Whether the district court's ruling and injunction is so vague that parties are incapable of ascertaining what violations they committed and how those violations should be addressed.

9. Whether the district court effectively altered the distribution obligation of voter registration agencies under 42USC§1973gg-5(a)(6)(A) by redefining the declination procedures established by the Act.

## STATEMENT OF THE CASE

This is a suit for declaratory and injunctive relief under the NVRA brought

by private plaintiffs pursuant to 42USC1973gg-9(b). The Complaint was filed by Roy Ferrand[1], Luther Scott, Jr. and the Louisiana State Conference of the NAACP ("State Conference") and persons similarly situated.[2] Plaintiffs sued the Louisiana Department of Health and Hospitals (DHH) and the Louisiana Department of Children and Family Services (DCFS) through their agency heads generally alleging that the agencies failed to offer voter registration services on all occasions and in the manner required by Section 7 of the NVRA (42USC1973gg-5).

Plaintiffs also named Schedler as Louisiana Secretary of State as Chief Elections Official of the State for his alleged failure to properly coordinate Louisiana's responsibilities under Section 7 of the NVRA, particularly in wrongly construing the statute to cover only **in person** applications for services, renewals, recertifications and change of address at public assistance offices designated as voter registration agencies pursuant to §1973gg-5(a)(2), referred to at times as "mandatory voter registration agencies."

The case was decided by the district court in two judgments. (Doc 212 and 437) The court decided the principal legal issue in the case on cross motions for summary judgment by Schedler and plaintiffs. (Docs 94, 112) On summary

---

[1]Roy Ferrand dismissed his claim by voluntary motion granted on 2/6/12 (Docs 123, 126).

[2]A class certification hearing was not requested or held, and no class was certified.

judgment Schedler took the position that Sections 4 and 7 of the NVRA (42USC1973gg-2 and 42USC1973gg-5) apply only to “in person” transactions at offices designated as voter registration agencies under Section 7(a)(2) of the Act. Plaintiffs argued that the Act should be construed more expansively to so called “remote” applications (those conducted online, by mail, telephone or other means) to further the purposes of the NVRA.

On May 3, 2012, the court entered Order and Reasons (Doc 212) denying Schedler’s and granting Plaintiffs’ motion for summary judgment as to the statutory interpretation of the NVRA. Therein, the court extended the NVRA to “remote” applications made through voter registration agencies designated under Section 7.

The remaining issues were tried on the merits October 15-17, 2012 after which the court issued Findings of Fact and Conclusions of Law (Doc 436) signed on January 22, 2013.

The court, on January 23, 2013, then issued Permanent Injunction (Doc 437) enjoining Schedler as follows:

> “That the Secretary of State is directed to maintain in force and effect his or her policies, procedures, and directives, as revised, relative to the implementation of the National Voter Registration Act with respect coordination of the National Voter Registration Act within Louisiana. As to any program to which the Secretary has not

> achieved substantial compliance with the provisions of the National Voter Registration Act, 42USC1973gg, *et seq*., the Secretary is directed to implement such policies, procedures, and directives as to each program no later than March 15, 2013, and certify such compliance to this Court."

No further direction was given by the court. Injunctions in similar terms were issued against DHH and DCFS.

The Findings of Fact and Conclusions of Law (Doc 436), a separate document signed January 22, 2013, make findings of fact with respect to NVRA violations by Schedler, R, 21461-63:

1. Other than providing training and publishing materials, the SOS does not engage in any other measures to ensure that public assistance offices are complying with their responsibilities under the NVRA.

2. The SOS training provided to agencies such as DHH and DCFS, have been inconsistent and inaccurate.
   a. As of 2011, the SOS did not have any requirement as to the number of trainings provided to DCFS or DHH per year.
   b. From the beginning of 2008 to the spring of 2011, the SOS did not conduct any NVRA training whatsoever for DCFS.

3. The trainings that the SOS conducted for DHH personnel in July 2009 and 2011 advised DHH personnel that DHH clients were only afforded an opportunity to register to vote only if DHH clients appeared in person at DHH offices.

4. The SOS does not advise DCFS or DHH with regard to distributing voter registration application forms to clients who did not respond to the voter declaration question.

5. Prior to April, 2011 the Defendants were in violation of the NVRA

mandates. Since the filing of this lawsuit, however, the Defendants have made substantial progress in complying with the NVRA.

The conclusions of law with respect to NVRA violations by Schedler are found at R, 21464-66:

1. The Secretary of State is responsible for:

    a. coordination of state responsibilities under the NVRA; and

    b. implementing the state's functions under the NVRA.

2. The Secretary of State is ultimately responsible for the compliance for the state of Louisiana under the NVRA.

3. The Secretary of State may not delegate its responsibilities under the NVRA thereby avoiding responsibility if the NVRA is not conducted reasonably.

4. The Secretary of State has failed to enforce the NVRA in Louisiana.

5. The Secretary of State has done nothing to ensure that the State comply with its NVRA obligations.

At R, 21444 and 21452, the district court finds Schedler in effect vicariously liable for NVRA violations of DCFS and DHH "insofar as the SOS is required to coordinate responsibilities under the NVRA."

The district court concluded that both Luther Scott and the State Conference had "standing," R, 21470, and that each were "irreparably injured" R, 21467, so as to entitle each to injunctive relief.

The court found plaintiffs were entitled to reasonable attorneys fees, litigation expenses and costs. R, 21470.

Schedler filed a Notice of Appeal (Doc 442) on February 19, 2013.

## STATEMENT OF FACTS

The National Voter Registration Act of 1993 (NVRA) was enacted by Congress on May 20, 1993 and made effective for the State of Louisiana January 1, 1995. (103 PL 31, 107 Stat. 77) The NVRA was implemented in Louisiana principally through the office of Commissioner of Elections.[3]

The method of implementing the Act in Louisiana was excluded from evidence at trial and was proffered in the form of Proffer 2. In general terms, Louisiana adopted legislation recommended by the Commissioner of Elections, met with and advised involved state agencies about NVRA requirements, developed training manual for registration, conducted training for the involved agencies, etc.

In the intervening years, from 1995 to 2011, when the present complaint was filed, Louisiana increased its percentages of citizens registered to vote to 85

[3]The Commissioner of Elections was originally designated as the chief elections official pursuant to 42USC§1973gg-8 by the Louisiana legislature. The Commissioner of Elections merged into the Secretary of State's office in 2004. Per La.R.S. 18:18, the Secretary of State was designated as the chief elections official at that time.

percent, among the highest state registration rates in the United States. Additionally, Schedler continued to train and revise training materials on NVRA implementation. Louisiana was one of the first states to implement online registration via www.geauxvote.com.

Plaintiffs in this litigation complained that registration numbers reported to the EAC with respect to registration at public assistance offices had declined since the inception of the NVRA, but the declining numbers are accounted for by the availability of other ways to register. The voter registration rate of 85% in Louisiana speaks to the effectiveness of Louisiana's voter registration efforts and programs.

Despite Louisiana's successful efforts in registering its citizens, Roy Ferrand, Luther Scott, Jr., and the State Conference filed a private action under 42USC§1973gg-9(b) alleging violations of the NVRA.

Facts Pertaining to the Individual Plaintiffs

Roy Ferrand voluntarily dismissed his claim.

Plaintiff, Luther Scott, Jr. was registered to vote in federal elections at all times pertinent to his grievance against the defendants. He registered to vote in 2008. His registration became effective June 10, 2008. He has been eligible to vote in federal elections since June 10, 2008. R, 21254-56. The NVRA violations

by which he claims to have been aggrieved all occurred after June 10, 2008--after he was registered and eligible and able to vote in federal elections.

As the basis for his claim, Scott first complained that he did not receive a voter application form with his application for food stamps at a DCFS office in September 2009. He was already registered to vote. Besides, Scott signed and dated a voter declination form along with his September 2009 application. Shawn Banks, DCFS intake employee, testified that Scott declined the opportunity to fill out a voter registration form during the food stamps application interview. R, 21185-94.

Scott next complained that in 2010, he was not given a voter registration form while changing or verifying (which was not clear) his address for food stamps with DCFS. Scott was registered and eligible to vote then.

Finally, Scott chose not to complete a voter registration form in December, 2011 in connection with a food stamp application through DCFS. The suit was filed prior to this particular declination. He was informed by DCFS employee Yolanda Ash that he had the opportunity to register. R, 21199-202.

Scott could have gone to the polls and voted after June 10, 2008. He was registered and eligible to vote in September 2009 when he applied for food stamps. He was registered and eligible to vote in 2010 when his address was

verified for food stamp benefits. He was registered and eligible to vote when the suit was filed in July 2011. He was registered and eligible to vote in December 2011 when he applied for food stamp benefits. He was registered and eligible to vote at the time of trial. His right to vote was not impaired by any alleged NVRA violation.

Facts Pertaining to the Organizational Plaintiff

The State Conference claims to operate under a charter that none of its representatives have ever seen. It operates under different names. R, 20959-64 and 20969-72. It is not incorporated. It has no individual members, its members are adult branches, youth councils, or prison branches, geographical entities that operate under their own charters. R, 20968. Its enunciated goal is to fight against racial discrimination. R, 20946.

Ernest Johnson is its president; Edward Taylor is Religious Affairs Coordinator. R, 20949. Whenever the organization receives funding from the national NAACP office to conduct voter registration, Taylor serves as the person in charge of voter registration. R, 20950.

Johnson had no knowledge that the State Conference expended resources in voter registration efforts directed at DCFS clients. He admitted there is no direct effort to register voters in public assistance. R, 20986-87. Johnson is aware of no

voter registration drives by the State Conference. R, 21004. Voter registration cards are passed out at meetings to the local units. R, 20988. Johnson is not aware of the State Conference ever having received grant money for any purpose. R, 20992-93.

Taylor, however, testified that all voter registration activity conducted by the State Conference for 2010 was funded by grants from NAACP national office: [1] $5,000 from "Let's Do It Again 2010" grant (SOS60); and [2] $5,000 from "2010 Get Out the Vote" grant (SOS56). However, both of these grants involved phone banking for calls to persons already registered to vote.

Taylor testified that State Conference adhered to the "Let's Do It Again 2010 Grant" purpose to increase the census count in specified "census tracts" to increase voter turnout in underperforming precincts. SOS60, p. 649. But, the program by its terms was census oriented, not voter registration oriented, "Our plan is to reach out to the 6 different census tract areas that are projected to have lower voter turnout percentages for the current census than they had in the 2000 Census." The plan was to use phone banks. (SOS60, p. 653), using a list of registered voters.

Enunciated goals were to "educate respondents on how important it is that everyone is accounted for, hence the theme of this program, 'Yes We Count;'" and

"increase the membership of the NAACP." SOS60, p. 653.

Taylor conceded that activities funded by "Let's Do It Again 2010" grant were phone banking. On redirect, his attorney pointed out that the budget also listed "door to door canvassing" as a proposal, but canvassing is described in the "Let's Do It Again" materials as "A person who knocks on the doors of voters encouraging voter participation in an upcoming election."

Regarding the "Get Out The Vote Grant" SOS56, Taylor testified that all activity funded was for phone banking. The toolkit Taylor said he used for this activity defines Phone Bank as "The organization of a group of telephones and callers who call registered voters and persuade them to vote." P238, p. 0099. Taylor testified that "...we used this as the last part to finish up telephone banking--to get the folks out to vote"; and admitted that this grant was not used for voter registration. R, 21055.

On questioning by the Court, Taylor said that State Conference received the grant money by checks from national NAACP. The checks were turned over to President Johnson and deposited in State Conference checking account. Johnson acknowledged at trial that he had testified in deposition that the State Conference had never "gotten grant money from anybody for anything."

Taylor claimed that checks were written from the State Conference account

to pay for expenses and that expenses were documented. However, see SOS38, a request for production propounded to the State Conference by Schedler for:

> "(a) a copy of all financial and expense records...for each and every voter registration drive...and (c) a copy of any and all notes, records, memoranda, correspondence, report, or other document of any kind or nature...concerning each and every voter registration drive,"

in response to which (SOS40), the State Conference produced no checks, no deposit slips, and no documentation of any kind for 2010 voter registration activity or expenditure. The grant, however, required that grant funds be deposited into an approved account; all bills for activities be paid by check; and the grantee "Must keep intact and reconcile all bank statements and cancelled checks. Monthly bank statements and cancelled checks <u>must be kept for three years...</u>" SOS60, p. 652. Taylor admitted the organization had no such records. R, 21085 and 95-96.

The trial court found that the State Conference "conducted" voter registration outside of DCFS and DHH offices. R, 21453.

The only evidence of such was the testimony of Taylor that he alone and personally offered voter registration approximately three times at a health unit[4] in Hammond and approximately three times at a food stamp office in Amite. R,

[4]Health unit is defined by Taylor to include a place where people apply for WIC benefits. R, 21030.

21033-36. Such activity is not included within the purpose of either grant. If Taylor did do so, he did not act pursuant to either grant as the grants were for phone banking and perhaps some door to door canvassing of voters. Taylor claims to have acted on behalf of the State Conference, but admits he acted alone and "personally," "in the sense that I was the one who did it", R, 21102, without letting the State Conference know that he was doing it. It is clear from the testimony that he was "on a frolic of his own."

Taylor testified that in 2004 an unidentified worker outside an unidentified health unit registered more voters at that health unit than at a Walmart or an apartment complex, R, 21031, so he felt that, in his "personal opinion," this was "fertile ground to register them." R, 21052.

Regarding the "health unit" in Hammond in 2010, no testimony was offered to show that the persons who filled out a registration form with Taylor were WIC public assistance applicants who had not been offered or filled out a registration form inside the building.

With respect to Taylor's 2010 efforts outside an Amite food stamp office, the only testimony regarding the practice of intake workers handling food stamp applicants was of Yolanda Ash, R, 21199-212, and Shawn Banks, R, 21184-94, intake workers at the New Orleans office, who testified that food stamp applicants

in 2009 and 2010 were offered the opportunity to register to vote, pursuant to established procedures of DCFS.

No registration effort by Taylor was shown to be linked to NVRA violations by any defendant, certainly not Schedler.

Facts Pertaining to the Secretary of State

The issues involving Schedler's liability were predominately legal and were framed by those stipulations. Stipulations 1-3, at the beginning of trial. R, 20608-09. Otherwise, Schedler provided training for public assistance voter registration agencies on how to comply with the NVRA, R, 21250-51, and creates and obtains preclearance of forms required for NVRA activity. R, 21251-52.

In accordance with federal regulation, Schedler reports annually to the Election Assistance Commission all activity conducted within the state under the NVRA, 42USC1973gg-7.

The manual, SOSEx25, entitled "Implementing the National Voter Registration Act in Voter Registration Agencies", promulgated by Schedler, for voter registration agencies was originally adopted to coordinate responsibilities under the NVRA for registering to vote (1) by application made simultaneously with a driver's license application, (2) by mail application, and (3) by application in person at public assistance agencies designated under NVRA Section 7, as

required by 42USC1973gg-2.

The manual includes the voter registration application mail in form that Schedler's predecessor developed, and precleared for use by voter registration agencies.

The manual tracks the terms of the NVRA with respect to voter registration agency obligations advising each agency that an opportunity to register should be offered "each time a person applies for service or assistance (including recertification, renewal and changes of address)." The manual states the voter registration agency "must provide the same degree of assistance to each person in completing the voter registration application as the official provides to a person in completing its own agency forms." The manual lists the 42USC1973gg-5(a)(5) activities that may not be performed by the voter registration agency, and lists what information must be confidential under the NVRA.

Further instructions in the manual set forth a procedure for conducting voter registration at the voter registration agency, the acceptance of completed voter registration applications, and the mailing to registrars of voters, as the NVRA requires. Voter registration agency officials are advised how to code forms received to allow for counting in EAC reports.

## SUMMARY OF ARGUMENT

The district court's rulings and orders in the case are expositions on the NVRA because the private plaintiffs who brought the suit lacked standing and the district court was without jurisdiction. Plaintiff, Luther Scott, Jr., failed to prove injury linked to the conduct of Schedler as Secretary of State, essential to Art. III jurisdiction. He similarly failed to prove that he was "aggrieved" by a "violation" of the NVRA because he was registered and eligible and able to vote in federal elections at all times pertinent to his claimed deprivation of the opportunity to register to vote. Scott admitted at trial that he never attempted to vote. He was never turned away from the polls. In sum, his right to vote was never impaired by the conduct of any defendant.

Plaintiff, State Conference, fared no better on proof of standing. Their representatives claimed waste of resources and expenditures in voter registration efforts, but were unable to present any credible evidence to substantiate their claim. But, more importantly, the State Conference presented no evidence at all that any voter registration effort, resource, or expenditure stemmed from a violation of the NVRA by the defendants.

Because neither plaintiff carried their threshold burden of proving standing, no case or controversy was presented to the court for resolution, and review of the

case need go no further.

Nor was injunctive relief justified by evidence of "irreparable injury". Scott could have gone to the polls to vote at any point in time during which he claimed a violation of the Act and so suffered no harm. The State Conference proved no irreparable injury. Apprehension of future injury does not warrant injunctive relief.

The district court's legal interpretations of the NVRA with respect to the agency registration provisions of the Act, Section 4(a)(3) and Section 7 (42USC§1973gg-2(a)(3) and §1973gg-5), were in error in several respects.

*First,* the court extended the application of the Act to "remote" agency transactions, by mail, telephone, and online, despite the clear provisions of 42USC§1973gg-2(i)(3) expressly limiting the coverage of the Act to "application **in person**...at federal, state or nongovernmental office designated under Section 7."

Clear, unambiguous terms of a statute should not be disregarded under the guise of statutory interpretation. Congress defined the scope of the agency provisions of the Act to include **in person** applications at offices designated as voter registration agencies under Section 7.

*Second,* the district court erred in its interpretation of what constitutes a

declination to register, in writing, under 42USC§1973gg-5(a)(6)(A)(ii) and (a)(6)(B) by changing the meaning of the language prescribed by Congress that "IF YOU DO NOT CHECK EITHER BOX [ON THE DECLARATION FORM], YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER AT THIS TIME." This tortured construction adopted by the court leads to absurd consequences, particularly for "remote" agency transactions.

*Third*, the district court erroneously found liability against Schedler for violations committed by DHH and DCFS based upon Schedler's failure to compel compliance by DHH or DCFS, co-equal agencies of state government. Schedler is not empowered by state law to enforce compliance against DHH or DCFS when no such powers can be inferred from 42USC§1973gg-8 by virtue of his designation as chief elections official for the state. So interpreted, the NVRA would run afoul of principles of federalism and intrude upon state sovereignty.

*Fourth,* even if injunctive relief were warranted, the injunction issued against Schedler is couched in terms so vague and uncertain that Schedler is exposed to contempt without knowing what he is enjoined to do. Such "follow the law" injunctions violate FRCP 65(d) and have been disapproved by this Court.

*Fifth*, the district court erred in declaring the plaintiffs, or either of them, to be prevailing parties as judgment in their favor as to Schedler is clearly erroneous

and based upon flawed interpretations of law.

## ARGUMENT

### I. STANDARD OF REVIEW

The grant of a summary judgment is reviewed *de novo*, viewing the material facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. Questions of law are reviewed *de novo*. *Anthony Ngomi Kariuki v. Tracy Tarango*, 709 F.3d 495 (5th Cir. 2013).

On appeal after a bench trial, findings of fact are reviewed for clear error, and conclusions of law *de novo*. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court based on all the evidence is left with the definitive and firm conviction that a mistake has been committed. Factual findings made under an erroneous view of controlling legal principles are reviewed *de novo*. *Flint Hills Resources LP v. JAG Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009).

Evidentiary rulings by the district court are reviewed for abuse of discretion. If the appellate court determines that an abuse of discretion has occurred, the court must then determine if the error affects a substantial right of the party or constitutes harmless error. *Price v. Rosiek Construction Company*, 509 F.3d 704, 707-708 (5th Cir. 2007). If the court's ruling excludes evidence, a party may make

an offer of proof to preserve the error for review by the appellate court. FRE 103(a)(2).

## II. STANDING

### A. General Principles of Article III Standing

The courts of the United States have an obligation to assure themselves of litigants standing under Article III of the U.S. Constitution. *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Even if constitutional standing is not raised by the parties, the court must, where necessary, raise it *sua sponte*. *SEC v. Forex Asset Management, LLC,* 242 F.3d 325, 328 (5 Cir. 2001).

This is so because the Federal Judiciary's authority to exercise judicial review and interpret the Constitution on the necessity to do so in the course of the judicial function of deciding cases. *Marbury v. Madison*, 5 U.S. 137 (1803). The case or controversy requirement under Article III assumes particular importance in ensuring that the Federal Judiciary respects the proper and properly limited role of the courts. *Allen v. Wright*, 468 U.S. 737, 750 (1984). If a dispute is not a proper case or controversy, the courts have no business in deciding it or expounding the law in the course of doing so. No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of

federal court jurisdiction to actual cases or controversies. *Raines v. Byrd,* 521 U.S. 811, 818 (1997).

The case or controversy requirement thus plays a critical role, and Article III standing enforces the Constitution's case or controversy requirement. *DaimlerChrysler Corporation v. Charlotte Cuno, et al.*, 547 U.S. 332, 341-342 (2006). *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Plaintiffs bear the burden of proving standing in order to invoke the court's jurisdiction under Art III's case or controversy requirement.

The inducible constitutional minimum of standing contains three elements. First, that plaintiffs must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant. Third, it must be likely as opposed to merely speculation that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

B. Private Right of Act Under NVRA

This private right of action under the NVRA requires a person aggrieved by a violation of the NVRA to provide written notice of the violation to Schedler, as

chief election official. If the violation is not corrected within 90 days, the aggrieved person may bring a civil action for declaratory or injunctive relief with respect to the violation. 42USC1973gg-9.

C. Neither Plaintiff Proved Notice--Statutory Standing Required Under 42USC1973gg-9

In an enforcement action under the NVRA, statutory standing relates to "nonjurisdictional limitations on cause of actions," such as the notice requirement of 42USC1973gg-9(b) requiring one aggrieved by a violation of the NVRA to first provide written notice of the violation to the state's chief election official, and afford 90 days to cure the violation before filing suit for relief. *National Council v. Miller*, 2012 WL 6691729, at *4 (D. Nev. 12/19/12). As noted in *National Council v. Miller*, at *7 and *6, "written notice is mandatory"[5], "...identifying specific violations of the NVRA and the harm that arises from them is the purpose of providing notice to the state so that it can remedy the harm to the person(s) through corrective measure." Neither plaintiff, Luther Scott nor the State Conference, offered evidence at trial that the required notice was filed and thus failed to meet this required burden of proving statutory standing.

Had Scott sent notice, any violation that he ultimately claimed could have

[5]Citing *Nat'l Coalition for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 286 (4th Cir. 1998); and *Broyles v. Texas*, 618 F.Supp.2d 661, 691-92 (S.D. Tex. 2009).

been remedied. The trial court found that Scott did not receive a voter registration form in his interactions with DCFS, R, 21439-40 and 43, AND also found that "Since April of 2011, the month the instant suit was filed, Scott has been offered voter registration forms several times." R, 21442. Had Scott afforded Schedler notice of his alleged violation as 42USC1973gg-9 requires before suit was filed, this alleged violation could have been cured and Scott's suit avoided altogether.

No standing is conferred if proper notice is not given since the 90-day period never runs, *Georgia State Conference of NAACP v. Kemp*, 841 F.Supp.2d 1320, 1335, *citing Broyles v. Texas, 618 F.Supp.2d 661, 692 (S.D. Tex. 2009).*

Neither plaintiff, Scott nor the State Conference, produced evidence at trial of the requisite statutory standing element - that notice was sent under 42USC1973gg-9. Having failed to meet this evidentiary burden, the district court was without jurisdiction.

### D. Luther Scott Failed to Prove That He Was Injured or Aggrieved By A Violation of the Act Conduct on the Part of the Secretary of State

Scott did not carry his burden of proving that he had either Art III or statutory standing. He demonstrated no injury linked to a violation of the NVRA. He registered to vote in 2008. SOS6. His registration became effective June 10, 2008. R, 21254. He has been eligible to vote in federal elections since June 10,

2008. R, 21255-56. The NVRA violations by which he claims to have been aggrieved all occurred after June 10, 2008--after he was registered and eligible and able to vote in federal elections.

The NVRA applies only to elections for federal office. *ACORN v. Miller*, 129 F.3d. 833, 837 (6th Cir. 1997). A party has no standing to sue under the NVRA where the right to vote in a federal election has not been infringed or impaired. *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989). It is essential to standing under the NVRA that plaintiff show that his right to vote in a federal election was impaired. *Krislov v. Rednour*, 946 F.Supp. 563, 566 (N.D. Ill. E. Div. 1996), cited favorably by the Fifth Circuit in *ACORN v. Fowler*, 178 F.3d. 350, 366 (5th Cir. 1999); *Broyles v. Texas*, 618 F.Supp. 661 (S.D. Tex. 2009); *Dobrovolny v. Nebraska*, 100 F.Supp. 1012 (D.Neb. 2000). Absent such a showing, plaintiff lacks standing, and the court lacks jurisdiction to decide the NVRA claim.

As the basis for his claim Scott first complains that he did not receive a voter application form with his application for food stamps at a DCFS office in September 2009. He was already registered to vote on that date. Besides, Scott signed and dated a voter declination form along with his September 2009 application. DCFS5, p. numbered 14, 31st page of exhibit. Shawn Banks, DCFS

intake employee, testified that her contemporaneous notes reflected that Scott declined the opportunity to fill out a voter registration form during the food stamps application interview in September 2009. R, 21191. By habit and practice, Ms. Banks offered voter registration to all food stamp applicants, without exception, and noted their choice in that regard in her activity log. R, 21187-91. Her activity log shows that Scott declined the proffered opportunity to complete a voter registration form during his food stamp interview in September 2009. R, 21191; see P145, p. 9383 and DCFS5, 15th page.

Scott next complained that in 2010, he was not given a voter registration form while changing or verifying (which was not clear) his address for food stamps with DCFS. Scott was registered and eligible to vote then.

Finally, Scott again chose not to complete a voter registration form in December, 2011 in connection with a food stamp application through DCFS. SOS4. The suit was filed prior to this particular declination. Presumably, Scott was aware of his opportunity to fill out a registration form through DCFS. If not, he was informed by DCFS employee Yolanda Ash that he had that opportunity. R, 21201-03 and 21209-12. Nonetheless, he declined the opportunity to change his voter registration address by completing a voter registration form in December 2011. SOS4, p. numbered 13, 20th page of exhibit. Scott has no basis for a

complaint in connection with the December 2011 food stamps application.

Once registered to vote, a Louisiana voter remains eligible to vote unless the voter moves out of parish. If the voter continues to reside in the parish in which he registered, his registration in that parish remains valid and effective even if his address changes within the parish. Angie Rogers, Louisiana Commissioner of Elections, so testified. R, 21255-56. The Louisiana fail safe provisions in the Louisiana Election Code so provide. La.R.S. 18:110, 521.

Scott testified that he lived in New Orleans during all times relevant to his claim. He said that he always lived in Louisiana, always in New Orleans. "I live here in the City and the State all my life." R, 20905. All of his applications with DCFS in 2009, 2010 and 2011 and both of his 2008 voter registration applications in May and August have New Orleans addresses. There is no evidence in the record that Scott lived outside New Orleans. Scott remained eligible to vote in federal elections once his voter registration application was approved and made effective June 10, 2008. The ERIN database shows that he has remained on the voter rolls since that date, and his registration has never been cancelled. SOS7.

Scott could have gone to the polls and voted after June 10, 2008. He was registered and eligible to vote in September 2009 when he applied for food stamps through DCFS. He was registered and eligible to vote in 2010 when his address

was verified for food stamp benefits. He was registered and eligible to vote when the suit was filed in July 2011. He was registered and eligible to vote in December 2011 when he applied for food stamp benefits. He was registered and eligible to vote at the time of trial. His right to vote was not impaired by any alleged NVRA violation. Scott was not injured in the Article III sense. He was not "aggrieved" under 42USC1973-gg(9)(b).

The most Scott can argue is that he was unaware that he was registered to vote. He said that he did not know. He admitted that he did not try to find out. R, 20928-29. However, the Louisiana voter registration records on ERIN reflect that the Registrar, on September 22, 2008, mailed Scott a voter confirmation letter at 510 St. Patrick Street in New Orleans, the address Scott provided, in accordance with La.R.S. 18:101.1, 115. SOS7, p. 3. Thereafter, Scott's registration was made effective June 10, 2008.

Scott had to prove his standing in order to invoke the court's jurisdiction. It was his threshold burden. He failed to carry it. He did not produce any evidence that he attempted to vote after June 10, 2008 and was prevented from voting. He did not show that he was prevented from voting in a federal election (or in any election) by reason of a NVRA violation (or for any other reason). He produced no evidence that his right to vote in a federal election was impaired. He presented

no evidence that he was injured or aggrieved by any alleged NVRA violation. Scott is not within the category of persons to whom a private right of action is granted by 42USC1973-gg(9)(b). He is not a "person aggrieved" by a violation of the Act.

The district court abused its discretion and clearly erred in concluding that he did.

E. State Conference Failed To Prove That It Was Aggrieved By A Violation on Part of the Secretary of State

In finding the State Conference "Has Standing", R, 21450-53, the court stated:

> "Accordingly, the LSC NAACP expended its limited resources, time and money to canvass and conduct voter registration outside of Louisiana DCFS and DHH offices. While the LSC NAACP does not target public assistance applicants, the LSC NAACP was still forced to expend resources registering Louisiana voter who would have been already registered if the Defendant had complied with the NVRA." Doc 436, R, 21452.
>
> "... could have expended its volunteer time and monetary resources on voter registration other than its activities outside of DCFS and DHH offices." R, 21452.
>
> "... could have spent its meager resources on other priorities." R, 21453.

These findings are unsupported by the evidence and are clearly wrong. The principal State Conference witness, Edward Taylor, admitted that all voter

registration activity conducted by State Conference for 2010 was funded by grants from NAACP national office: $5,000 from "Let's Do It Again 2010" grant, SOS60; and $5,000 from "2010 Get Out the Vote" grant, SOS56. Both involved phone banking for calls to persons already registered to vote, not unregistered voters.

Taylor admitted that the Get Out The Vote grant was not used for voter registration. R, 21055, lines 14-17.

Moreover, the self-serving testimony of the State Conference expenditures was unsupported by any accounting for the monies or records of any kind showing how the money was spent.

The district court erred in finding that "there were no reporting requirements in connection with this funding." R, 21450. Not only were bank records required to be maintained, but weekly activity and financial reports, detailing all activities, with attached receipts/invoices for expenditures, were required to be made on a form provided by the national NAACP. SOS60, p. 651. This glaring lack of records, reports and bank records, make the alleged grant funded voter registration activity suspect at best.

The only evidence of "conduct [of] voter registration outside of Louisiana DCFS and DHH offices" was the testimony of Taylor that he alone and personally

offered voter registration approximately three times at a health unit where a WIC office may have been located, in Hammond, R, 21030, and approximately three times at a food stamp office in Amite, R, 21033-36.

Such activity is not included within the purpose of either grant. Taylor did not tell anyone involved with the State Conference that he was doing this activity. R, 201102.

Taylor did so, he claims, because in his "personal opinion," this was "fertile ground to register them." R, 21052. He claims that if he had not found unregistered people, he "would have found another location to set up registration." R, 21036.

Whether any of the people Taylor registered were offered the opportunity to register at public assistance offices were benefit or assistance applicants at all, nothing in the record relates Taylor's efforts to violations of the NVRA by any defendant.

No registration effort by Taylor was shown to be linked to NVRA violations by any defendant, certainly not Schedler. These efforts by Taylor are distinguishable from the efforts by *ACORN* plaintiffs at public assistance offices mentioned in *ACORN v. Fowler*, 178 F.3d 350, 360-361 (5th Cir. 1999). Taylor alone went to one food stamp office in Amite and one health unit in Hammond,

perhaps three times altogether.

Johnson's admission that the State Conference engaged in "no direct effort to register voters who are in public assistance," R, 20987; and Taylor's lack of knowledge of a figure or amount of time spent by State Conference in attempting to register voters at either DCFS or DHH public assistance offices (because he had no such knowledge), R, 21108, shows that this was not organizational activity by the State Conference but simply Taylor on his own, if at all.

The evidence does not show that Taylor's personal effort to register people outside a food stamp office or health unit amounted to "wasted resources" of the State Conference. Taylor testified that the State Conference has no shortage of volunteers, it has volunteers who will "work and never get a dime." R, 21116. Obviously Taylor counts himself in that number.

The State Conference failed to carry its burden to establish standing. In *ACORN Fair Housing v. LeBlanc,* 211 F.3d 298, 305 (5th Cir. 2000), this Court cited *ACORN v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) for the proposition that "an organization could have standing if it had proven a drain on its resources counteracting the effect of defendant's actions." Citing the "conjectural and hypothetical nature" of the organization's testimony," failure to mention "any specific projects it put on hold," and failure to "describe in any detail how *ACORN*

had to redouble efforts in the community to combat" defendant's action, this Court found *ACORN* failed to satisfy the injury in fact requirement and lacked standing.

Like the plaintiff in *National Council v. Miller,* 2012 WL 6691729 (D. Nev. 2012) at *13, the State Conference's "self described objectives, activities and practice contradict their assertion they have spent additional resources." Like the *Nevada* plaintiff, the State Conference has been a strong advocate for citizens to participate in the electoral process, particularly among low income citizens. The fact that Taylor alone, by self described happenstance, found individuals to register during his three visits outside an Amite food stamp office and three visits outside a Hammond health unit is not a wasted resource. If he had not obtained registration there, he would have gone to a WalMart to register other low income individuals. No activity suffered by these efforts.

Like the plaintiffs in the *Nevada* case, the State Conference "has failed to show any 'concrete and particularized' facts that they have conducted any voter registration drives other than what they would have done had Nevada [Louisiana] been in compliance with the NVRA." *National Council*, at *13.

The State Conference did not allege as the basis of its complaint the wholesale failure to implement the NVRA. Rather, it claimed deficiencies in the execution of the program at public assistance offices. Under the *ACORN* decision,

the State Conference must prove that it devoted resources to voter registration efforts because the involved state agencies failed to offer the opportunity to register. This is the link that must be shown. This is the link that has not been shown. Evidence of this connection--the *ACORN* court termed it a concrete and demonstrable injury directly resulting from the alleged violation of the NVRA[6]--is absent from the record.

Taylor's statement that people entering or leaving a building that houses a food stamp or WIC office are unregistered in greater numbers than people who shop at Walmart could be true. But, this does not tend to prove that a state agency failed to offer voter registration to food stamp clients who visited the office for one of the purposes prescribed by the Act, to complete an application, change of address, renewal or re-certification form. See, 42USC1973gg-5(a)(6)(A). It may be equally true that people entering or leaving a food stamp office buy fewer food items than people entering or leaving a Whole Foods Store, but that does not imply that the food stamp office failed in its responsibilities and caused the difference. A link cannot be presumed but must be proved.

The State Conference had the burden of proving standing and the burden of producing sufficient evidence to prove a link between their organizational

[6] *ACORN v. Fowler*, 178 F.3d 350, 362, (5th Cir. 1999)

activities and a specific deficiency in execution of the Act in a particular public assistance office and Schedler's responsibility for that deficiency.

The key to organizational standing is a link between organizational dedication of resources and Schedler's alleged violations of the Act, and the organization failed to carry its burden of production on the issue. In statutory parlance, the organization must be "aggrieved" or, as explained in the *ACORN* decision, must have suffered a concrete and demonstrable injury directly resulting from its claims that Schedler violated the NVRA. It is not enough that the State Conference has an interest in voter registration and voter registration is the subject of the NVRA statute.

Not only did the trial court err in finding standing on behalf of the State Conference, it further erred when the district court found the organization suffered "irreparable injury" to entitle it to injunctive relief. At R, 21467, "The Court finds...the LSC NAACP...irreparably injured by the failure of the SOS to comply with the mandates of the NVRA." Exactly with which mandates Schedler failed to comply are not specified with respect to food stamp and WIC applicants. The "remote application" issue is obviously not included because those Taylor encountered at the food stamp and the health unit (WIC) were, if public assistant applicants at all, in person applicants at best.

Having failed in its burden to prove either statutory or Article III standing, the district court erred in finding the State Conference had standing to pursue this private right of action under the NVRA.

III. IN PERSON APPLICATIONS - The district court erred in ruling on summary judgment that the "agency registration" provisions of the NVRA extend to "remote" transactions--those made by telephone, mail and online, when the clear language and the architecture of the Act limit its application to "in person" applications

Among the violations charged against Schedler by the original plaintiffs was the claim that Schedler wrongly interprets Sections 4 and 7 of the NVRA, 42USC§1973gg-2 and §1973gg-5, to apply to "in person" applications only at offices designated pursuant under §1973gg-5(a)(2).[7] Early in the litigation, Schedler filed a motion for partial summary judgment on that issue. Doc 94. The other defendants filed similar motions, and the plaintiffs filed cross motions for partial summary judgment.

The district denied the defendants' motions and granted partial summary judgment in favor of the plaintiffs holding that the Act covers "both in person transactions and remote transactions, including those via the internet, telephone and mail". Doc 212, Order and Reasons.

Schedler appeals the trial court's interpretation for *de novo* review by this

[7]At trial the "in person" issue was preserved in Stipulation 1.

Court as an erroneous interpretation of the NVRA's clear provisions on agency transactions covered by the Act. In effect, the district court authored an amendment to the NVRA that extended its coverage to transactions not otherwise covered by the present terms of the Act.

A. Enactment of the National Voter Registration Act

The NVRA was enacted by Congress in 1993 to establish procedures designed to increase the number of eligible voters in federal elections while protecting the integrity of the electoral process. Prior to the NVRA, voter registration occurred primarily at traditional voter registration offices, parish registrar of voters offices in Louisiana. The Act was meant to broaden registration opportunities by offering registration at offices frequently used by persons who might not otherwise register at a registrar's office.

With the objective of expanding opportunity to register, the NVRA mandated that each state adopt, in addition to its existing voter registration methods, procedures to register to vote in federal elections. The registration mandates under the NVRA required states to enact procedures for voter registration in three areas--(1) application simultaneously with driver's license application, (2) mail application, and (3) application **in person** at traditional voter registration sites and at federal, state or non-governmental offices designated

under specific provisions of the Act. 42USC§1973gg-2. With respect to applications at offices designated under Section 7 of the Act, Congress expressly and explicitly provided that the Act mandated voter registration services for applications made **in person** at the designated agencies.

The NVRA is rare among Congressional acts for its specificity. The Act is couched in particular, concrete terms, at times in excruciating detail, not unlike an instruction manual. It leaves little room for expansive interpretation as to its meaning.

B. Interpretation of NVRA Provisions Defining Transactions Covered by the Act

The interpretation of a statute or law begins with the express language of the statute. In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished, *Cowart v. Nicklos Drilling Co.*, 112 S.Ct. 2589 (1992); *First American Bank v. Resolution Trust Corporation*, 30 F.3d 644 (5 Cir. 1994). In that regard, the NVRA speaks in clear, unambiguous terms with respect to in person applications at public assistance and disability services offices. Section 1973gg-2(a)(3) mandates the adoption of procedures for voter registration in elections for

Federal office "for application **in person**" at designated public assistance and disability services offices designated as voter registration agencies pursuant to §1973gg-5. "For application **in person**" is clear and free from any ambiguity.

The plain language of the Act requires voter registration procedures for in-person transactions at public assistance and disability services offices in such unambiguous terms that only an active imagination could enlarge Congress' express meaning. "The plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity of an acute and powerful intellect would discover." *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925).

Congress' use of "in person" in defining the kind of applications covered by the NVRA is not mere surplusage. It is used to delineate a distinct category of transactions covered by the Act, namely applications in-person at certain designated offices. In interpreting statutes, "we must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous." *Tanuja Sahai Guil Waggoner v. Alberto R. Gonzales*, 488 F.3d 632 (U.S.C.A. 5 Cir. 2007).

Schedler submits that the trial court erred extending the Act to remote transactions. By its terms, the NVRA applies to **in person** applications at public

assistance and disability services offices. It clearly says so.

> §1973gg-2. National procedures for voter registration for elections for federal office
>
> (a) . . . each state shall establish procedures to register to vote in elections for federal office.
>
> * * *
>
> (3) by application **in person**
>
> * * *
>
> (B) **At** a federal, state, or non governmental office designated under section 1973gg-5 of this title.

In House Report 103-9 (103 H. Rpt. 9), Congress made it clear that Section 4(a), (42USC1973-gg(2)(a)), mandates that States adopt procedures in three areas, (1) simultaneously with an application for a drivers license; (2) by mail application; and (3) by application **in person**, either at an appropriate registration office or at a Federal, State or private sector location (called "agency registration" in the House Report).

With respect to "agency registration", the House Report states at p. 4:

> "Section 4(a) requires that States, in addition to any other methods for voter registration provided for under State law, establish procedures to permit voter registration in elections for Federal office: simultaneously with an application for a drivers license; by mail application; by application in person, either at an appropriate registration office, or at a Federal, State or private sector location ('agency registration')".

Were the language of the Act not so explicit, the structure of the NVRA

makes Congress' intent clear with respect to transactions and activities requiring voter registration by the designated agencies. In Section 4 (§1973gg-2), Congress mandated that states adopt procedures for voter registration is three areas--simultaneously with drivers license applications, by mail, and for **in person** applications at designated state and federal agencies. It would seem obvious enough that those sections of the NVRA that follow Section 4--that is Section 5 (drivers license applications), Section 6 (registration by mail) and Section 7 (**in person** applications at designated agencies)--do not expand the covered transactions defined in Section 4. The structure of the Act is plain and obvious in that regard, but to the extent that further explanation is required, the House Report makes it abundantly clear that "agency registration" applies to in person applications at designated agencies.

The district court's construction of the Act disregards its architecture. Again, §1973gg-2 calls for the states to establish procedures for voter registration in connection with three categories of agency transactions. The first area under §1973gg-2(a)(1) is by simultaneous application for a motor vehicle driver's license (frequently referred to as the "Motor Voter" provision). Section 5 of the Act (42U.S.C.1973gg-3) then details how voter registration is to occur in connection with motor vehicle license applications. Similarly, §1973gg-2(a)(2)

mandates the adoption of voter registration procedures for mail applications, and Section 6 (42USC1973gg-4) details the requirements for mail registration. §1973gg-2(a)(3) requires the establishment of procedures for application **in person** at sites designated under Section 7 (42USC1973gg-5). Section 7 (§1973gg-5) then details how applications in person at designated offices should occur.

It borders on the absurd to say that Section 7 has nothing to do with **in person** transactions. This construction of the statute would mean that the states are required to establish registration procedures for in person transactions but need not adopt any procedures at all for "remote" transactions. Such an anomalous construction of the statute demonstrates the district court's interpretive error in extending the coverage of Section 7.

Schedler suggests that the district court fell into error in two respects. First, the court seized on §1973gg-5(a)(6) and employed that provision as an exegetical fulcrum to construe the Act. §1973gg-5(a)(6) requires that designated voter registration agencies that provide service or assistance in addition to voter registration services distribute voter registration forms along with their service application forms. Reading that provision in isolation, the court reasoned that the NVRA must extend to "remote" transactions if the agency's service application

form is provided by remote means. In other words, the terms of the NVRA must extend to "remote" applications if remote applications are used by the agency for its other services. The district court's analysis not only has the tail wagging the dog, it has the dog running in a circle.

It is §1973gg-2 that defines transactions covered by the NVRA, and §1973gg-5 details how voter registration services are to be offered for those covered transactions. Seizing on a provision in §1973gg-5 that applies to a defined set of covered transactions--those conducted **in person** at designated agency locations--led the district court to err in extending the Act to "remote" transactions that are nowhere mentioned in the NVRA.

In interpreting statutes, "we must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous." *Tanuja Sahai Guil Waggoner v. Alberto R. Gonzales*, 488 F.3d 632 (5 Cir. 2007). Provisions of a statute are not to be interpreted in isolation, as the district court did here, but are to be construed with the other provisions of the statute and read as a whole.

Second, the district court sacrificed the express provisions of the Act to its objectives. Again, Congress adopted a statute in specific, concrete terms. It said that states must adopt procedures in accordance with the Act for **in person**

transactions at designated voter registration agencies. Congress could have provided that states must adopt procedures for **all** applications at designated voter registration agencies. It did not. The courts are not the appropriate body to extend NVRA coverage to "remote" transactions no matter how laudable the court's intentions may be. Rewriting a statute is a job for Congress, not for the courts. *Gonzales v. Arizona*, 453 F.Supp.2nd 997, 1003 (D. Arizona 2006). It is not the function of the courts to reformulate a statute in pursuit of its purpose or in light of changing realties.

No legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the essence of legislative action. It frustrates legislative intent to assume simplistically that whatever furthers the statute's primary objective must be the law. *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158, 171 (2007); *Rodriguez v. United States,* 480 U.S. 522, 525-526 (1987).

In this instance, the district court did what Congress has not done by extending the NVRA to "remote" transactions. Uniform voter registration requirements for remote agency transactions may be desirable, but the NVRA as presently written, does not include provisions for remote transactions.

It is worth noting that Congress introduced HR 5799 in 2012 to consider

modernization of the NVRA to cover "remote" transactions at designated voter registration agencies. The district court declined Schedler's request for judicial notice of HR 5799, R, 20599, and Schedler has moved this court to take judicial notice of the proposed amendment. Respondents argued in their Brief in Opposition to Motion for Stay Pending Appeal that HR 5799 has not been reported out of committee and may not be enacted by Congress. The implication is that it is up to the courts to take up the amendment because Congress has not.

While the modernization of the NVRA may be warranted in view of present agency practices, it is the job of Congress to consider how the voter application process would work best, particularly with electronic transactions where the present iteration of the Act does not work as the argument in this brief demonstrates with respect to the declination provisions set out in Section 7(a)(6)(B) of the Act.

Congress is certainly aware of electronic transactions and has modernized other voting and registration statutes to cover electronic transactions, as for example with military registration and balloting. 42USC§1973ff-1. Whether amending the NVRA to cover "remote" transactions is a good idea, Congress has not done so to this point.

## IV. FAILURE TO ENFORCE-District Court Erred by Assigning Enforcement Authority Over Other State Agencies to the Secretary of State as Chief Election Official and Holding the Secretary of State Responsible for Failure to Enforce NVRA Against State Agencies

Congress enacted the NVRA in the exercise of authority over federal elections granted in the Elections Clause of the United States Constitution. USCA Const. Art I, §§2, cl. 1, et seq. 4, cl. 1; Amend. 17 and *ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995).

However, the Act did not dictate to the states how they were to accomplish the implementation of NVRA mandates. Rather, the states were left to implement NVRA mandates in the manner deemed most efficacious within the context of the states' respective governmental structures and laws. For example, states have variously adopted commission systems, enacted legislation, empowered different state officials to execute the states' obligations, and adopted differing schemes with respect to the registration requirements of the NVRA.

Voter registration under the NVRA can be carried out by different agencies within a state, whenever an agency performs the state functions that correspond to a method of registration under the Act. For example, where a state's department of motor vehicles issues driver's licenses, that department would handle registration under the "motor voter" provisions, Section 5. A state agency that

administers Medicaid and/or related services would be the appropriate agency to conduct "agency registration" for the state, Section 7.

The adoption of procedures required by Section 4 could likewise take a number of forms, such as legislation, agency rules, executive orders or other methods of legislation or rulemaking that may be established in the different states. It would be odd, in fact, to expect to find the same model for implementing registration in any two states given each state's structure of government, exercise of sovereign authority and voter registration systems within each state.

The NVRA did, however, require states to appoint an official, called chief election official, to coordinate the state's responsibilities to orchestrate the efforts of the involved agencies. Coordination of responsibilities depends, again, upon how the various states structured implementation of the Act. The states were given leeway under the Act to structure implementation among its agencies and to assign powers and authority to its Chief Election Officer consonant with that state's governmental structure and method of implementation.

The method of implementation chosen by Louisiana was in large part excluded from the evidence in this case by the district court. [R, 21260-62 and 21267-68. The testimony was proffered as Proffer 2.] Evidence of how the Act was implemented in Louisiana is crucial to a review and understanding of the role

of its Chief Elections Official.[8]

It has been argued at times in this litigation and considered in some reported decisions that enforcement powers over state and local agencies is inherent in the coordination of state responsibilities under the Act else the chief election official could not effectively fulfill its role in NVRA implementation. See, for example, *Valdez v. Herrera*, 2010 U.S. Dist. LEXIS 142209.

But, such powers cannot be inferred from the terms of the NVRA; nor does the Act imply that it purports to alter the exercise of the states' sovereign authority among its agencies. Congress did not constrain state governments to a single method of implementation that would restructure the governmental relationships between and among state and federal authorities. Had Congress so intruded on the sovereign powers of the states, principles of federalism "might well have threatened the validity of the Act." See, *ACORN v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995). The same result would follow a similar court-imposed directive to so empower a state agency where the state itself has not, and the state agencies are found, as here, to be in "substantial compliance" with the terms of the NVRA.

The district court here found that state law, La.R.S. 18:18(A)(2), (3) and (8),

---

[8]The predecessor to the Secretary of State as chief elections official for Louisiana was the Commissioner of Elections, Department of Elections and Registration. R, 21239-40 and 21244-45.

gave general "rule-making" and enforcement authority over registration to Schedler, R, 21437, but no such authority resides in La.R.S. 18:18. Rather than granting "general" rule-making powers over other state agencies, the statute limits the Secretary's authority to rules to be applied by registrar of voters in the state. The scope of the statute is narrow and specific. Nothing in its suggests that Louisiana has given the Secretary broad rule-making and enforcement powers over other state agencies.

The record nowhere contains evidence or law that would enable Schedler to take, for instance, DHH to task; to reduce its budget; to discipline its employees or in any manner to enforce, penalize or compel compliance by another state or local agency other than the parish registrars.

Unlike *Harkless v. Bruner*, 545 F.3d 445 (6 Cir. 2008), relied upon by the district court, in which Ohio statutory law actually did empower the Ohio Secretary of State to compel compliance by designated voter registration agencies, the Louisiana statute limits the Secretary's authority to registrars of voters.

Louisiana has not given Schedler authority over public assistance voter registration agencies. Enlarging the Secretary's powers and authority is a matter for the Louisiana Legislature, not for the federal district court. The State of Louisiana simply made different choices than did Ohio in establishing the powers

and authority of voter registration agencies.

La.R.S. 18:18 cannot reasonably be construed, as the district did, to bridge the chasm between "coordination of responsibilities" and "rule-making and enforcement" over other state agencies. The State has a duty to carry out the mandates of the Act, but is has the discretion as to means and methods of enforcing the Act's mandates among its agencies.

Through Schedler's purported failure to enforce NVRA mandates against DCFS and/or DHH, the district court found Schedler responsible for violations of the Act complained of by the plaintiffs. The State of Louisiana was not sued in this case. While the State of Louisiana may have a "non-delegable duty," that duty is not by operation of law assigned to the chief election official. Again, the duty may be shared among the state legislature and the various agencies and enforced by mechanisms in place for those agencies within the state. Schedler is responsible to coordinate, but not to enforce or compel, and a violation of the Act cannot arise out of the failure to exercise authority that Schedler does not have.

Schedler is Louisiana's chief state election official and is "responsible for coordination of state responsibilities under the Act," 42USC1973gg-8. The NVRA defines "State" to include "a state of the United States" and defines "voter registration agency" to mean "an office designated under section

7(a)(1)[42USC§1973gg-5(a)(1)] to perform voter registration activities." 42USC1973gg-1. Throughout the NVRA, certain duties are assigned to the "state" and in Section 7, duties are assigned to "voter registration agencies." One duty assigned to the State is to "establish procedures to register to vote in elections for federal office...(3) by application in person...(B) at a Federal, State or non governmental office designated under Section 7", 1973gg-2. Another duty designated to the "State" is to designate as voter registration agencies all offices in the State that provide public assistance, 1973gg-5(a)(2)(A). The duties set forth in the majority of gg-5, at (a)(4)-(6), are duties assigned to a "voter registration agency."

The district court erred in expanding the duties imposed on Schedler set forth in 1973gg-8 beyond coordination to include the duty to "ensure the public assistance [voter registration] agencies are complying with their responsibilities under the NVRA." The district court erred in finding Schedler in effect vicariously liable for NVRA violations by DCFS and DHH at its public assistance agencies.

The district's court's partial quote of 1973gg-6(a), R, 21465, leaves the impression that Schedler is charged under the NVRA with ensuring "that any eligible applicant is registered to vote in an election." When the complete section

is read, the only required assurance applicable is for "each State" to ensure that any eligible applicant is registered to vote in an election...(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the less of 30 days, or the period provided by State law, before the date of the election." 42USC1973gg-6(a)(1)(C).

The excluded evidence by Elsie Cangelosi (Proffer 2) would show that Schedler's predecessor did develop agency training programs for implementation of the NVRA. The current training manual "Implementing The National Voter Registration Act at Voter Registration Agencies," SOSEx25, instructs voter registration agency personnel to:

> •Offer the opportunity to register to vote each time a person applies for service or assistance (including recertification, renewal, and change of address or name)
> •Assist the person in completing the mail voter registration application unless the person refuses. The official must provide the same degree of assistance to each person in completing the voter registration application as the official provides to a person completing its own agency forms. (SOS25, p. 5)

The manual provides a sample Declaration Statement, SOS25, p. 17, and provides that one must be completed for each person. The training power point, SOS28, presentation provides the same instructions.

## V. DECLINATION FORMS, DISTRIBUTION OF VOTER REGISTRATION FORMS AND THE *VALDEZ* DECISION

The district court ruled that the obligation to distribute voter registrations forms by public assistance offices continues in effect under the NVRA unless the applicant marks the "NO" box on the declination form; otherwise, the declination is not "in writing" and does not relieve the agency of its distribution obligation. In so ruling, the district court relied upon the *Valdez*[9] decision from the Tenth Circuit.

The issue is a legal one, set for decision by Stipulation 1, No. 3 in the trial record. Schedler submits that the reasoning of *Valdez* and by extension the district court here is in error on this issue. Unless a signed declination form is construed to constitute the "writing" contemplated by 42USC1973gg-5(a)(6)(A)(ii), the declination scheme under Section 7 becomes surplusage and has no meaning at all.

Section 7(a)(6)(A) requires mandatory voter registration agencies to distribute with their own forms for benefit or assistance applications, re-certifications, renewals and change of address a voter registration form, unless the applicant declines the opportunity to register to vote "in writing". 1973gg-5(a)(6)(A)(ii).

---

[9] *Valdez v. Squier*, 676 F.3d 935 (10th Cir. 2012)

Section 7(a)(6)(B) prescribes the form, variously called a declaration or a declination form, that is to serve as the writing in the event the applicant declines the opportunity to register. 1973gg-5(a)(6)(B).

The required declination question, expressly mandated by 1973gg-5(a)(6)(B)(I), is,

> "If you are not registered to vote where you live now, would you like to apply to register to vote **here today**?"
>
> □ YES □ NO

Then, in prominent type, the form must by the terms of the statute advise the applicant,

> "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.

The *Valdez* court and the district court here held that checking the "NO" box is a declination to register "in writing" for all purposes, so that the public assistance agency has no obligation to give the applicant a voter registration form if the NO box is checked; not checking any box at all only means that the applicant has declined to register "at this time...at the time they are present in one of HSD's offices [public assistance office] seeking assistance" so that the agency must still give the applicant a registration form if a box is not checked. *Valdez*,

supra. 945-946.

This construction of the Act is so anomalous that it renders the declination provisions of Section 7 absurd. The question posed to the applicant is, "would you like to apply to register to vote **here today**?" By the district court's reasoning answering "NO" to that question by checking the NO box means nothing more than the applicant has opted not to register at the time of his application--"here today". It strains the imagination to see how checking the NO box differs from not checking a box at all according the *Valdez* and the district court. Both answers mean the same thing--that the applicant declines to register to vote at the time of application--"here today" or "at this time".

With respect to an applicant who does not check either box on the declaration form, the *Valdez* court reasons, "it is conceivable that an applicant who chooses not to register at that time might still be interested in receiving a mail voter registration form and completing it at another time and/or location." Is it not equally conceivable that an applicant who checks the NO box in response to the question, would you like to register to vote here today, might be interested in receiving a mail voter registration form to fill out at another time or location? The distinction that the *Valdez* court makes in regard to the declination form is so contrived and artificial that it defies rational explanation.

Schedler's position that not checking a box on the form constitutes a declination is supported not only by the explicit language mandated by Congress on the declination form but by the Joint Conference Committee Report on the Act in reconciling the House and Senate versions of the NVRA at the time of its adoption as well as the FEC implementation manual created for assistance to the states for implementation of the NVRA.

Schedler's understanding in regard to the execution of declination forms derives from the Federal Elections Commission's 1993 FEC Guide to Implementing the NVRA. In that publication, the FEC, in addition to a written explanation of the procedure, provides a flow chart (p. 1-9, at R, 15486) as to how the registration procedures are intended to work. The flow chart with respect to agency registration begins with Block One, the "Agency offers applications." There appear two options at that point, either the "applicant declines application" or the "applicant completes application". Where the "applicant declines application", the "agency retains the declination" and is directed to "STOP."

The Joint Conference Committee Report on the Act in reconciling the House and Senate versions of the NVRA says the following with respect to the requirements of 42USC1973gg-5(a)(6)(B),

*"Another provision (Section 7(a)(6)(B) would require an agency to*

*include on a form the question 'If you are not registered to vote where you live now, would you like to apply to register to vote here today?' In response to that question, the form would include a box for the applicant to accept or decline to apply to register to vote.* ***Failure to check either would be deemed a declination for purposes of this provision.*** *"* (excerpt from Joint Statement of the Committee of Conference) [emphasis supplied]

Schedler followed the guidance of the FEC and the Joint Conference Committee in that regard. The declaration form is the "writing" referred to in 42USC1973gg-5(a)(6)(A)(ii). The declaration informs the applicant in all capital letters "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME." In that context and with that instruction, the applicant is told that he need not check a box in order to decline. Not checking a box in those circumstances constitutes the affirmative act of declining the opportunity to register. Treating a declaration form as something other than a writing depending upon whether or not the box on the form is checked or not checked makes no sense in the context of the transaction.

Similarly, the Federal Election Commission in its principal publication on the Act's requirements states with regard to Section 7(a)(6)(A) and (B) "Those who decline to register to vote must do so in writing or by not checking a box on a form that contains wording specified in the Act." Nothing in the FEC manual on

the implementation of the NVRA even hints that voter registration forms must be given to those persons who decline the opportunity to register. See, "Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples, prepared by The National Clearinghouse on Election Administration, Federal Election Commission, January 1, 1994".

The *Valdez* formulation does, however, reinforce the argument that the NVRA applies only to "in person" transactions. The statutorily required declination form is unworkable with remote transactions because the language contained on it has no meaning to an applicant completing an application by mail, telephone or online. The declination provisions become inoperative in the context of remote applications.[10] With respect to the failure to check either box, Valdez says, "the phrase 'AT THIS TIME" means that the failure must instead be interpreted simply as a decision by the applicant not to register to vote at that time, i.e., <u>at the time they are present in one of the HSD offices seeking services or assistance</u>." *Valdez*, 946.

Applying agency registration provisions to anything other than "in person" applications would render the declination form meaningless. The declination

[10]Use of the declination question, "would you like to register to voter here today?" makes it clear that the NVRA was never intended to apply to remote applications.

question, "would you like to register to voter here today?" on a telephone application would be nonsensical. Yet the NVRA expressly mandates that question, in those terms. And how would the remote applicant decline "in writing" in response to that question by telephone or online? If the voter answered, no, over the telephone, would the agency interviewer mail the applicant a declination form? Even if the voter received a declination form and checked the NO box declining to register "here today", what would the declination mean by the time the return mail arrived? Schedler cannot conceive of how it should advise the assistance agencies or coordinate the Act with respect to remote applications and declination procedures.

Under the district court's reasoning the declination procedure explicitly prescribed by Congress is unworkable in the context of a remote application. Schedler suggests that this is so because Congress never contemplated that the agency registration provisions of the NVRA would be applicable to anything other than "in person" applications.

## VI. INJUNCTION

### A. The Injunction Is Void For Failure To Comply With F. R. Civ. P. Rule 65(d)

Federal Rule of Civil Procedure Rule 65(d)(1) mandates the content and

scope of injunctions:

> (1) *Contents*. Every order granting an injunction and every restraining order must:
>
> (A) state the reasons why it issued;
>
> (B) state its terms specifically; and
>
> (C) describe in reasonable detail - and not by referring to the complaint or other document - the act or acts restrained or enjoined.

The Permanent Injunction issued against Schedler is of no effect for failure to comply with Rule 65(d)(1). The permanent injunction is no more than an "obey the law" as to the entire NVRA (not just Section 7 at issue in this proceeding) to the unspecified extent not already done as to unspecified "programs."

In *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 898 (5th Cir. 1978), the Fifth Circuit held "Such 'obey the law' injunctions cannot be sustained." See also *Keyes v. School District No. 1, Denver Colorado,* 895 F.3d 659, 668 (10th Cir. 1990). In *Wynn Oil Company v. Purolator Chemical Corporation*, 536 F.2d 84, 86 (5th Cir. 1976), the Fifth Circuit held:

> "The injunction must give the party adequate notice of the wrong enjoined. Professor Moore states that '(l)oose injunction orders are neither easily obeyed nor strictly enforceable, and are apt to be oppressive. Hence Rule 65(d) further provides that every restraining order and injunction be specific in terms...".

In all three cases, the appellate courts reversed injunctions failing to satisfy the Rule 65(d)(1) requirement of specificity. "The rule embodies the elementary due process requirement of notice." "The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *United States Steel Corporation v. United Mine Workers of America,* 519 F.2d 1236, 1246 and fn. 20 (5th Cir. 1975).

The United States Supreme Court has recognized the necessity of Rule 65(d) compliance:

> "As we have emphasized in the past, the specificity provisions of Rule 65(d) are no mere technical requirement. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. *** Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The injunction orders Schedler to implement procedures, etc. for unspecified programs to achieve "substantial compliance" with the entire NVRA. No specifics nor reasonable detail are provided. The injunction says no more than "obey the law".

The nonspecificity of the injunction leaves Schedler to guess what

"programs" are at issue and the areas where substantial compliance has not been achieved. Although the Complaint and trial involved only NVRA violations by/at public assistance agencies under Section 7 of the NVRA, the injunction addresses the entire NVRA, without limit to Section 7 violations. These are the very problems Rule 65 was designed to address. The failure to comply with Rule 65 should render the injunction void.

### B. Neither Party Established Irreparable Harm In Order To Entitle It To Injunctive Relief Against the Secretary of State

The district court found Scott and the State Conference were irreparably injured "by the failure of DCFS, DHH (as to LSC NAACP only) and the SOS to comply with the mandates of the NVRA." R, 21467.

Scott suffered no irreparable harm by any action or inaction of DHH in his encounters with that office. Scott was at all relevant times registered to vote and able to vote in federal elections. Scott admitted that he never even attempted to vote during that time. R, 20908. He has not suffered irreparable harm.

The State Conference has "volunteers that work and never get a dime." R, 21116. It has suffered no irreparable harm by one of those volunteers, Taylor, having been present at one food stamp office and one health office in 2010 to offer voter registration applications there. The espoused harm of "wasted resources" is

monetary in nature and otherwise therefore not irreparable, *National Council v. Miller*, 2012WL6691729 (D.Nev. 12/19/12), *18.

The district court correctly enunciated the four prong test a plaintiff must prove to establish entitlement to injunctive relief (R, 21466) but erred in finding either plaintiff satisfied that prong. Failing to establish irreparable injury, the injunction must be reversed.

## VII. PREVAILING PARTY AND ATTORNEY FEES

The court erred in holding plaintiffs were prevailing parties and entitled to the recovery of attorney fees, costs and expenses against Schedler. That holding should be reversed.

If in fact, Scott is a prevailing party, the violation by which he was aggrieved relates only to food stamp applications at particular offices in particular years and only to DCFS.

If in fact the State Conference is a prevailing party, the violations by which it is aggrieved relate only to in person food stamp applications, again DCFS, and to in person WIC applications, only to DHH.

Under the NVRA private right of action, the private party can only recover with respect to the violation by which it is aggrieved.

## CONCLUSION

For the foregoing reasons, the decisions appealed to this court for review should be reversed.

RESPECTFULLY SUBMITTED,

s/Celia R. Cangelosi
CELIA R. CANGELOSI
Louisiana Bar Roll No. 12140
918 Government Street, Suite 101
P. O. Box 3036
Baton Rouge, Louisiana 70821-3036
Telephone: (225) 387-0511
Facsimile: (225) 387-1973
celiacan@bellsouth.net

s/Carey T. Jones
CAREY T. JONES
Bar Roll No. 07474
1234 Del Este Avenue, Suite 803
P.O. Box 700
Denham Springs, LA 70727
Telephone: (225) 664-0077
Facsimile: (225) 664-9477
tjones@tomjoneslaw.com

*Attorneys for Defendant - Appellant, Tom Schedler, in his Official Capacity as Louisiana Secretary of State*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the "Original Brief of Appellant, Tom Schedler, In His Official Capacity as Louisiana Secretary of State" has been electronically delivered, via the electronic filing system or U.S. Mail, to the following counsel of record:

Ronald L. Wilson (cabral2@aol.com)
Dale Ho (dho@naacpldf.org)
Leah Aden (laden@naacpldf.org)
Elise Boddie (eboddie@naacpldf.org)
Israel David (israel.david@friedfrank.com)
Ryan Haygood (rhaygood@naacpldf.org)
Natasha Korgaonkar (nkorgaonkar@naacpldf.org)
Jesse Loffler (jesse.loffler@friedfrank.com)
David Yellin (david.yellin@friedfrank.com)
Michael de Leeuw (michael.deleeuw@friedfrank.com)

Baton Rouge, Louisiana, this 15th day of April, 2013.

s/Celia R. Cangelosi
CELIA R. CANGELOSI

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed.R.APP.P.32(a)(7)(B) because:

☒ this brief contains13,913 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a mono spaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed.R. App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using Corel WordPerfect X5 in 14 pt. Times New Roman, *or*

☐ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

s/Celia R. Cangelosi
Celia R. Cangelosi

Attorney for Tom Schedler, in his official capacity as Louisiana Secretary of State, Defendant-Appellant

Dated: April 15, 2013

PL 103–31, May 20, 1993, 107 Stat 77

UNITED STATES PUBLIC LAWS
103rd Congress - First Session
Convening January 5, 1993

Additions and Deletions are not identified in this document.
8848

PL 103–31 (HR 2)
May 20, 1993
NATIONAL VOTER REGISTRATION ACT OF 1993

AN ACT to establish national voter registration procedures for Federal elections, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 42 USCA Ch. 20 >>

<< 42 USCA § 1973gg NOTE >>

SECTION 1. SHORT TITLE.

This Act may be cited as the "National Voter Registration Act of 1993".

<< 42 USCA § 1973gg >>

SEC. 2. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds that—
(1) the right of citizens of the United States to vote is a fundamental right;
(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.
(b) PURPOSES.—The purposes of this Act are—
(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
(3) to protect the integrity of the electoral process; and
(4) to ensure that accurate and current voter registration rolls are maintained.

<< 42 USCA § 1973gg–1 >>

SEC. 3. DEFINITIONS.

As used in this Act—
(1) the term "election" has the meaning stated in section 301(1) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431(1));
(2) the term "Federal office" has the meaning stated in section 301(3) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431(3));


WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

(3) the term “motor vehicle driver's license” includes any personal identification document issued by a State motor vehicle authority;

(4) the term “State” means a State of the United States and the District of Columbia; and

(5) the term “voter registration agency” means an office designated under section 7(a)(1) to perform voter registration activities.

<< 42 USCA § 1973gg–2 >>

SEC. 4. NATIONAL PROCEDURES FOR VOTER REGISTRATION FOR ELECTIONS FOR FEDERAL OFFICE.

(a) IN GENERAL.—Except as provided in subsection (b), notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office—

(1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 5;

(2) by mail application pursuant to section 6; and

(3) by application in person—

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 7.

(b) NONAPPLICABILITY TO CERTAIN STATES.—This Act does not apply to a State described in either or both of the following paragraphs:

(1) A State in which, under law that is in effect continuously on and after March 11, 1993, there is no voter registration requirement for any voter in the State with respect to an election for Federal office.

(2) A State in which, under law that is in effect continuously on and after March 11, 1993, or that was enacted on or prior to March 11, 1993, and by its terms is to come into effect upon the enactment of this Act, so long as that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

<< 42 USCA § 1973gg–3 >>

SEC. 5. SIMULTANEOUS APPLICATION FOR VOTER REGISTRATION AND APPLICATION FOR MOTOR VEHICLE DRIVER'S LICENSE.

(a) IN GENERAL.—(1) Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

(2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

(b) LIMITATION ON USE OF INFORMATION.—No information relating to the failure of an applicant for a State motor vehicle driver's license to sign a voter registration application may be used for any purpose other than voter registration.

(c) FORMS AND PROCEDURES.—(1) Each State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license.

(2) The voter registration application portion of an application for a State motor vehicle driver's license—

(A) may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));

(B) may require only the minimum amount of information necessary to—

(i) prevent duplicate voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that—

(i) states each eligibility requirement (including citizenship);

(ii) contains an attestation that the applicant meets each such requirement; and



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(iii) requires the signature of the applicant, under penalty of perjury;

(D) shall include, in print that is identical to that used in the attestation portion of the application—

(i) the information required in section 8(a)(5)(A) and (B);

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes; and

(E) shall be made available (as submitted by the applicant, or in machine readable or other format) to the appropriate State election official as provided by State law.

(d) CHANGE OF ADDRESS.—Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

(e) TRANSMITTAL DEADLINE.—(1) Subject to paragraph (2), a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2) If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

<< 42 USCA § 1973gg–4 >>

SEC. 6. MAIL REGISTRATION.

(a) FORM.—(1) Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 9(a)(2) for the registration of voters in elections for Federal office.

(2) In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 9(b) for the registration of voters in elections for Federal office.

(3) A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

(b) AVAILABILITY OF FORMS.—The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

(c) FIRST–TIME VOTERS.—(1) Subject to paragraph (2), a State may by law require a person to vote in person if—

(A) the person was registered to vote in a jurisdiction by mail; and

(B) the person has not previously voted in that jurisdiction.

(2) Paragraph (1) does not apply in the case of a person—

(A) who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1 et seq.);

(B) who is provided the right to vote otherwise than in person under section 3(b)(2)(B)(ii) of the Voting Accessibility for the Elderly and Handicapped Act (42 U.S.C. 1973ee–1(b)(2)(B)(ii)); or

(C) who is entitled to vote otherwise than in person under any other Federal law.

(d) UNDELIVERED NOTICES.—If a notice of the disposition of a mail voter registration application under section 8(a)(2) is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 8(d).

<< 42 USCA § 1973gg–5 >>

SEC. 7. VOTER REGISTRATION AGENCIES.

(a) DESIGNATION.—(1) Each State shall designate agencies for the registration of voters in elections for Federal office.

(2) Each State shall designate as voter registration agencies—

(A) all offices in the State that provide public assistance; and



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

(3)(A) In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies.

(B) Voter registration agencies designated under subparagraph (A) may include—

(i) State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) that provide services to persons with disabilities; and

(ii) Federal and nongovernmental offices, with the agreement of such offices.

(4)(A) At each voter registration agency, the following services shall be made available:

(i) Distribution of mail voter registration application forms in accordance with paragraph (6).

(ii) Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

(iii) Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

(B) If a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home.

(5) A person who provides service described in paragraph (4) shall not—

(A) seek to influence an applicant's political preference or party registration;

(B) display any such political preference or party allegiance;

(C) make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote; or

(D) make any statement to an applicant or take any action the purpose or effect of which is to lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits.

(6) A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall—

(A) distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—

(i) the mail voter registration application form described in section 9(a)(2), including a statement that—

(I) specifies each eligibility requirement (including citizenship);

(II) contains an attestation that the applicant meets each such requirement; and

(III) requires the signature of the applicant, under penalty of perjury; or

(ii) the office's own form if it is equivalent to the form described in section 9(a)(2),

unless the applicant, in writing, declines to register to vote;

(B) provide a form that includes—

(i) the question, “If you are not registered to vote where you live now, would you like to apply to register to vote here today?”;

(ii) if the agency provides public assistance, the statement, “Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.”;

(iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), “IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.”;

(iv) the statement, “If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private.”; and

(v) the statement, “If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with __________.”, the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(7) No information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration.

(b) FEDERAL GOVERNMENT AND PRIVATE SECTOR COOPERATION.—All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a), and all nongovernmental entities are encouraged to do so.

(c) ARMED FORCES RECRUITMENT OFFICES.—(1) Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States.

(2) A recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency designated under subsection (a)(2) for all purposes of this Act.

(d) TRANSMITTAL DEADLINE.—(1) Subject to paragraph (2), a completed registration application accepted at a voter registration agency shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2) If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

<< 42 USCA § 1973gg–6 >>

SEC. 8. REQUIREMENTS WITH RESPECT TO ADMINISTRATION OF VOTER REGISTRATION.

(a) IN GENERAL.—In the administration of voter registration for elections for Federal office, each State shall—

(1) ensure that any eligible applicant is registered to vote in an election—

(A) in the case of registration with a motor vehicle application under section 5, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 6, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except—

(A) at the request of the registrant;

(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) inform applicants under sections 5, 6, and 7 of—

(A) voter eligibility requirements; and

(B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

(b) CONFIRMATION OF VOTER REGISTRATION.—Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.); and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(c) VOTER REMOVAL PROGRAMS.—(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that—

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

(B) Subparagraph (A) shall not be construed to preclude—

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

(ii) correction of registration records pursuant to this Act.

(d) REMOVAL OF NAMES FROM VOTING ROLLS.—(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(B)(i) has failed to respond to a notice described in paragraph (2); and

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

(e) PROCEDURE FOR VOTING FOLLOWING FAILURE TO RETURN CARD.—(1) A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

(2)(A) A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant—

(i) shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

(ii)(I) shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(II) shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

(B) If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

(3) If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

(f) CHANGE OF VOTING ADDRESS WITHIN A JURISDICTION.—In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

(g) CONVICTION IN FEDERAL COURT.—(1) On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 10 of the State of the person's residence.

(2) A notice given pursuant to paragraph (1) shall include—

(A) the name of the offender;

(B) the offender's age and residence address;

(C) the date of entry of the judgment;

(D) a description of the offenses of which the offender was convicted; and

(E) the sentence imposed by the court.

(3) On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

(4) If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

(5) The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender resides of the information received under this subsection.

<< 39 USCA § 3629 >>

<< 42 USCA § 1973gg–6 >>

(h) REDUCED POSTAL RATES.—(1) Subchapter II of chapter 36 of title 39, United States Code, is amended by adding at the end the following:

“§ 3629. Reduced rates for voter registration purposes

“The Postal Service shall make available to a State or local voting registration official the rate for any class of mail that is available to a qualified nonprofit organization under section 3626 for the purpose of making a mailing that the official certifies is required or authorized by the National Voter Registration Act of 1993.”

<< 39 USCA § 2401 >>

<< 42 USCA § 1973gg–6 >>

(2) The first sentence of section 2401(c) of title 39, United States Code, is amended by striking out “and 3626(a)–(h) and (j)–(k) of this title,” and inserting in lieu thereof “3626(a)–(h), 3626(j)–(k), and 3629 of this title”.

<< 39 USCA § 3627 >>



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

<< 42 USCA § 1973gg–6 >>

(3) Section 3627 of title 39, United States Code, is amended by striking out "or 3626 of this title," and inserting in lieu thereof "3626, or 3629 of this title".

<< 39 USCA Ch. 36 >>

<< 42 USCA § 1973gg–6 >>

(4) The table of sections for chapter 36 of title 39, United States Code, is amended by inserting after the item relating to section 3628 the following new item:
"3629. Reduced rates for voter registration purposes.".

<< 42 USCA § 1973gg–6 >>

(i) PUBLIC DISCLOSURE OF VOTER REGISTRATION ACTIVITIES.—

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

(j) DEFINITION.—For the purposes of this section, the term "registrar's jurisdiction" means—

(1) an incorporated city, town, borough, or other form of municipality;

(2) if voter registration is maintained by a county, parish, or other unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

(3) if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated municipalities or other geographic units.

<< 42 USCA § 1973gg–7 >>

SEC. 9. FEDERAL COORDINATION AND REGULATIONS.

(a) IN GENERAL.—The Federal Election Commission—

(1) in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3) not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this Act on the administration of elections for Federal office during the preceding 2–year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this Act; and

(4) shall provide information to the States with respect to the responsibilities of the States under this Act.

(b) CONTENTS OF MAIL VOTER REGISTRATION FORM.—The mail voter registration form developed under subsection (a)(2)—

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that—

(A) specifies each eligibility requirement (including citizenship);



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works. 

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application—

(i) the information required in section 8(a)(5)(A) and (B);

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

<< 42 USCA § 1973gg–8 >>

SEC. 10. DESIGNATION OF CHIEF STATE ELECTION OFFICIAL.

Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act.

<< 42 USCA § 1973gg–9 >>

SEC. 11. CIVIL ENFORCEMENT AND PRIVATE RIGHT OF ACTION.

(a) ATTORNEY GENERAL.—The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this Act.

(b) PRIVATE RIGHT OF ACTION.—(1) A person who is aggrieved by a violation of this Act may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

(c) ATTORNEY'S FEES.—In a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs.

(d) RELATION TO OTHER LAWS.—(1) The rights and remedies established by this section are in addition to all other rights and remedies provided by law, and neither the rights and remedies established by this section nor any other provision of this Act shall supersede, restrict, or limit the application of the Voting Rights Act of 1965 (42 U.S.C. 1978 et seq.).

(2) Nothing in this Act authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.).

<< 42 USCA § 1973gg–10 >>

SEC. 12. CRIMINAL PENALTIES.

A person, including an election official, who in any election for Federal office—

(1) knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for—

(A) registering to vote, or voting, or attempting to register or vote;

(B) urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

(C) exercising any right under this Act; or

(2) knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by—

(A) the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or


WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

(B) the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held,

shall be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 5 years, or both.

<< 39 USCA §§ 2401 nt, 3627 nt >>

<< 39 USCA § 3629 nt >>

<< 42 USCA §§ 1973gg NOTE, 1973gg–1 nt, 1973gg–2 nt, 1973gg–3 nt, 1973gg–4 nt, 1973gg–5 nt, 1973gg–6 nt, 1973gg–7 nt, 1973gg–8 nt, 1973gg–9 nt, 1973gg–10 nt >>

SEC. 13. EFFECTIVE DATE.

This Act shall take effect—

(1) with respect to a State that on the date of enactment of this Act has a provision in the constitution of the State that would preclude compliance with this Act unless the State maintained separate Federal and State official lists of eligible voters, on the later of—

(A) January 1, 1996; or

(B) the date that is 120 days after the date by which, under the constitution of the State as in effect on the date of enactment of this Act, it would be legally possible to adopt and place into effect any amendments to the constitution of the State that are necessary to permit such compliance with this Act without requiring a special election; and

(2) with respect to any State not described in paragraph (1), on January 1, 1995.

Approved May 20, 1993.

PL 103–31, 1993 HR 2

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.



WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.